IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 39167

| | | |
|---|---|---|
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) ) | 2011 Unpublished Opinion No. 748 |
| Petitioner-Appellant, | ) ) ) | Filed: December 19, 2011 |
| | ) | Stephen W. Kenyon, Clerk |
| v. | ) ) | |
| | ) | THIS IS AN UNPUBLISHED |
| JOHN (2011-15) DOE, | ) ) | OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| Respondent-Appellant. | ) ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Cathleen MacGegor Irby, District Judge.

Decree terminating parental rights, <u>affirmed</u>.

Alan E. Trimming, Ada County Public Defender; Joshua M. Wickard, Deputy County Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Marcy J. Spilker, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Judge

John Doe (Father) appeals from the magistrate's decree terminating his parental rights to his daughter, Jane Doe (Daughter). For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

Daughter was born on December 8, 2008, to Father and his wife (Mother). Between August and September 2009, the Department of Health and Welfare (Department) received four reports of drug activity and domestic violence involving Father and Mother. On September 24, Father was arrested and incarcerated on charges of felony drug possession and violation of a no-contact order with Mother. On October 2, with Father still incarcerated, Daughter was

1

removed from Mother's care on the basis of neglect.[1]  Several days later, Father attended the shelter care hearing where the magistrate vested custody of Daughter in the Department.  On November 2, Father entered a stipulation acknowledging Daughter had been neglected and without proper parental care and control, and agreed to an order placing Daughter in the custody of the Department.

In late 2009, a case plan was approved by the magistrate with the stated goal of reunifying Daughter with Father.  The case plan addressed four issues of concern which led to the finding of neglect:  (1) instances of domestic violence perpetrated by Father against Mother; (2) Father's incarceration due to domestic violence, lack of anger management, and repeated violations of the law; (3) Father's history of substance abuse and his resulting inability to provide proper parental care; and (4) Father's failure to provide for Daughter's basic needs in a stable home environment.  While Father was still incarcerated, he appeared at the case plan hearing and agreed to the terms.  In February 2010, a judgment of conviction was entered against Father for felony possession of a controlled substance, and he was sentenced to seven years' incarceration with one year determinate.  Father was also sentenced for two separate violations of a no-contact order, which were to run concurrently with his felony sentence.

On April 5, 2010, a six-month review hearing was held.  On October 8, 2010, after Daughter had been in the Department's custody for nearly twelve months, a permanency hearing was conducted pursuant to Idaho Code § 16-1622.  Afterwards, the magistrate issued an order approving adoption as the permanent plan for Daughter, citing her need for permanency and stability.  Accordingly, on November 5, the Department filed a petition for termination of the parent-child relationship alleging Father and Mother neglected Daughter.  On March 18, 2011, Father was released from incarceration and placed on parole.  He filed an amended answer to the termination petition, requesting more time to complete the case plan.  The magistrate denied the request.

The Department filed an amended petition for termination of the parent-child relationship, alleging neglect on three grounds.  First, pursuant to Idaho Code §§ 16-1629(9) and

---

[1]     Mother voluntarily relinquished her parental rights to Daughter on December 16, 2010, and is not a party to this action.

16-2002(3)(b), Count II[2] alleged Father neglected Daughter because he failed to comply with court orders or the case plan, and reunification with Daughter had not occurred within fifteen of the last twenty-two months since Daughter entered shelter care. In Count III, pursuant to Idaho Code § 16-1602(25)(b), the Department alleged Father was unable to discharge his parental responsibilities and as a result of that inability, Daughter lacked the parental care necessary for her health, safety, or well-being. Specifically, the Department noted Father was incarcerated for over seventeen months, was just released on parole, had a sentence satisfaction date of September 2016, and demonstrated an inability to comply with the law--all of which were contrary to Daughter's well-being. The Department indicated there were concerns as to whether Father could refrain from ongoing criminality and/or the use of illegal substances and provide Daughter with a safe, continuous residence while meeting Daughter's daily needs for a prolonged, indeterminate period. Finally, in Count IV, pursuant to Idaho Code § 16-1602(25)(a), the Department alleged Father neglected Daughter because she was without proper parental care and control or subsistence, education, medical or other care and control necessary for her well-being as a result of the conduct or omission of her parents. Specifically, the Department alleged Father was currently unable to independently provide for the housing, financial, subsistence, and/or other needs of himself and/or his child and would be unable to demonstrate his ability to do so for a prolonged, indeterminate period.

The termination trial took place over five days between March 23 and June 14. The evidence at trial showed Father was first incarcerated at age eighteen in Arizona for aggravated assault, and upon his release, he reoffended by committing a dangerous drug offense and was sentenced in August 1999 to four and a half more years in prison. In addition to the above offenses, while in Arizona he was also convicted of theft, trafficking in stolen property, and burglary and was incarcerated there for approximately eight and a half years.

Father moved to Idaho and in 2008, married Mother. Mother had two children from a previous marriage who lived with her and Father. On November 11, 2008, approximately one month before Daughter was born, Father was taken into custody and received a misdemeanor citation for domestic battery against Mother. He subsequently pled guilty to an amended charge of disturbing the peace and was ordered to complete anger management education.

---

[2]    "Count I" in the petition related to the termination of Mother's parental rights.

3

On July 17, 2009, law enforcement responded to Father's and Mother's home upon a report of domestic violence. Mother and a neighbor reported to the responding officer that Mother had been battered by Father in the presence of Daughter. Mother also reported Father battered her several days earlier, slapping her and pulling some of her hair out, leaving a bald spot that she showed the officer. On August 2, officers were again dispatched to Father's and Mother's residence after receiving a report that Father again battered Mother by threatening her with a knife and attempting to strangle her in the presence of their children. Mother told officers Father threatened to kill her several times that day and officers observed scratches on Mother as well as petechial hemorrhaging, which indicated attempted strangulation. Father had fled the scene and officers eventually found him hiding in weeds near his residence. An officer observed track marks on Father's arm consistent with intravenous drug use. Father was arrested and charged with domestic battery, attempted strangulation, and domestic assault on Mother. The charges were eventually dismissed.

On September 24, police stopped the vehicle in which Father and Mother were riding for violation of a no-contact order between them. The officer observed that Father appeared to be very intoxicated, under the influence of what the officer believed was oxycodone or heroin, and observed track marks on Father's arm. Father was arrested and following a search of his vehicle, officers found approximately 150 pills (later identified as oxycodone), drug paraphernalia, and a firearm. Further, after observing suspicious behavior by Father once he was transported to the police station, officers discovered a white powder, identified as methamphetamine, in the patrol car where Father had been sitting. As a result, Father was convicted in February 2010 of felony possession of a controlled substance and sentenced to incarceration for seven years unified with one year determinate. Two days later, Father was sentenced for two separate violations of a no-contact order with Mother. At the time, Father had been incarcerated for five months and spent an additional twelve months in prison until he was released on parole on March 18, 2011. At the time of trial, Daughter was approximately thirty months old. Father had been incarcerated for all but ten months of her life and, at thirty-two years old, had been incarcerated for approximately eleven years of his life.

The evidence at trial further established Father began using marijuana at age fourteen and methamphetamine at age fourteen or fifteen. Father testified methamphetamine had been his "drug of choice" and he had "no idea" when the last time he used it was. He testified that while

4

incarcerated, he participated in and completed the Therapeutic Community ("TC") program, which included substance abuse treatment. In his drug and alcohol use history that he completed for the TC program, he denied ever having used illegal prescription medication and stated he had not disclosed any illegal use of prescription drugs.

However, Dr. Grant Belnap, a psychiatrist, testified that in 2008, Father came to him for treatment of a self-reported addiction to prescription medication and the treatment continued for nearly a year. Father told Dr. Belnap he used several types of opiates, but hydrocodone was his most common choice and he acquired the drugs from friends or off the "street." Dr. Belnap indicated he diagnosed Father with opioid dependence and prescribed a pharmaceutical replacement therapy. During April and May 2009, Dr. Belnap observed that Father continued his opioid dependence and was not doing well. He saw Father again on July 2, 2009, and recommended Father continue treatment on a monthly basis; however, he never saw Father again. Dr. Belnap testified that during the time he provided treatment in 2008-2009, Father made minimal or no improvement in his addiction.

Several of Father's TC counselors testified, all indicating he had generally done well in the program and was even chosen as a mentor. However, all indicated they would consider it very problematic if Father had not disclosed the entirety of his drug use.

At the termination trial, when Father was asked whether he has "issues with domestic violence," Father responded:

> That's a good question. I would say I definitely need to take a look at it. You know, when I think of domestic violence, I think of physical violence, and I was actually informed that's just not the case. I mean, it could just be verbally, so then, yeah, I think that I might have some issues with that, definitely need to address that.

He denied ever having physically assaulted Mother. However, Tom Wilson, who completed a risk to child assessment on Father, testified that even though Father denied having a problem with domestic violence during the assessment, taking into consideration Father's criminal past, especially his history of reported domestic violence and substance abuse issues, Father posed a high risk to neglect Daughter. Wilson recommended Father attend a minimum of twenty-six weeks of domestic violence counseling and receive substance dependence treatment with relapse prevention. Wilson estimated it would take six months to a year of such treatment for Father to

5

be prepared to fulfill the entirety of his recommendations for substance abuse treatment, relapse prevention, domestic abuse treatment, and parenting classes.

At the time of trial, Father had not completed domestic violence counseling, parenting education, or a substance abuse treatment aftercare program as prescribed by the case plan. Chera Kelsey, a social worker, testified that Father did not have access to domestic violence treatment while incarcerated, and although he had since been attending such treatment for approximately one month, he could not receive parenting education until he completed domestic violence treatment. She also indicated Father was currently attending an aftercare class on relapse prevention. The social worker testified that in her estimation, Father would need approximately a year to complete the recommended treatment and then, given his history, approximately another year to demonstrate his compliance with the treatment before he could parent Daughter full-time.

Father testified as to his employment history, stating that at some point he owned several businesses. In 2005, he was employed moving furniture for approximately six months, but was unemployed for a period of time after Daughter was born. Father testified that in 2009, before he was incarcerated, he was employed by at least four different car dealerships as a salesman. When the termination trial commenced, he was periodically working for his mother's cleaning business, but did not have a set schedule. By the last day of the trial, he testified that he recently become employed at Idaho Auto Mall. Father also testified that after having lived with a friend's family for several months subsequent to being released from prison, he recently moved to a townhome with no roommates.

The social worker and a visit coordinator testified that Father's supervised visits with Daughter, both while he was incarcerated and after his release, went well, and he was attentive to Daughter's needs, he was protective, he brought appropriate snacks, he engaged with the child on her level, and she seemed to respond well to him. It was noted, however, that over an eight-month period, Father only spent approximately twenty-eight hours with Daughter.

On August 30, 2011, the magistrate issued a memorandum decision and order finding Father neglected Daughter on all three counts and that it was in Daughter's best interests to terminate the parent-child relationship. On September 21, the magistrate entered Findings of Fact, Conclusions of Law, and a Decree terminating Father's parental rights as to Daughter. Father now appeals the termination of his parental rights.

## ANALYSIS

On appeal, Father contends the magistrate's decision to terminate the parent-child relationship between him and Daughter was not supported by clear and convincing evidence. Specifically, Father contends the magistrate erred in finding he neglected Daughter and finding it was in the best interests of Daughter for his parental rights to be terminated.

Parental rights are a fundamental liberty interest, constitutionally protected by the Fourteenth Amendment. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). In order for the State to intervene and terminate the parent-child relationship, due process requires the State to prove that termination is in the best interests of the child and that one of the statutorily approved grounds for termination are present. I.C. § 16-2005(1); *In re Doe*, 151 Idaho 356, 362, 256 P.3d 764, 770 (2011). Idaho Code § 16-2005 lists those statutory grounds as the following: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged, indeterminate period, which will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will likely remain incarcerated for a substantial period of time during the child's minority. Each statutory ground is an independent basis for termination.

Idaho Code § 16-2002(3) defines "neglect" in two ways. The first is conduct defined in Idaho Code § 16-1602(25), which defines "neglected," in pertinent part, as a child:

> (a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parent . . . or their neglect or refusal to provide them; . . . or
> (b) Whose parents . . . are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . ."

Secondly, a child is considered neglected in situations where the "parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9)." I.C. § 16-2002(3)(b). Idaho Code § 16-1629(9) provides, in pertinent part:

> There shall be a rebuttable presumption that if a child is placed in the custody of the department and was also placed in out of the home care for a period not less

than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care, the department shall initiate a petition for termination of parental rights. This presumption may be rebutted by a finding of the court that the filing of a petition for termination of parental rights would not be in the best interests of the child or reasonable efforts have not been provided to reunite the child with his family, or the child is placed permanently with a relative.

This provision creates a presumption in favor of the Department initiating a termination petition when a child has been in the State's custody and not in the parent's care for fifteen out of twenty-two months; it does not create a presumption that it is in the best interests of the child to terminate parental rights. *State v. Doe*, 144 Idaho 534, 536, 164 P.3d 814, 816 (2007).

In a proceeding to terminate a parent-child relationship, the due process clause mandates that grounds for termination must be shown by clear and convincing evidence. *State, Dept. of Health & Welfare v. Roe*, 139 Idaho 18, 21, 72 P.3d 858, 861 (2003)*; In re Baby Doe,* 130 Idaho 47, 53, 936 P.2d 690, 696 (Ct. App. 1997)*; In re Cheatwood*, 108 Idaho 218, 219, 697 P.2d 1232, 1231 (Ct. App. 1985). When the trial court finds that the grounds as defined by statute, which are alleged for termination, are established by clear and convincing evidence, those findings will not be overturned on appeal unless they are clearly erroneous. *In re Crum*, 111 Idaho 407, 408, 725 P.2d 112, 113 (1986); *Baby Doe*, 130 Idaho at 53, 936 P.2d at 696. Clear error, in turn, will not be deemed to exist where the findings are supported by substantial and competent, albeit conflicting, evidence. *Crum,* 111 Idaho at 408, 725 P.2d at 113. Substantial competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe*, 151 Idaho at 363, 256 P.3d at 771; *In re Doe*, 143 Idaho 343, 345-46, 144 P.3d 597, 599-600 (2006). In reviewing such findings, this Court will indulge all reasonable inferences in support of the trial court's judgment. *In re Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991); *Baby Doe*, 130 Idaho at 53, 936 P.2d at 696. This Court gives deference to the trial court's findings since the magistrate is in a better position to observe the witnesses' demeanor, to assess their credibility, to detect prejudice or motive, and to judge the character of the parties. *State, Dept. of Health & Welfare v. Doe*, 145 Idaho 662, 664, 182 P.3d 1196, 1198 (2008).

A.     **Neglect**

Here, the magistrate found the Department proved by clear and convincing evidence that Father exhibited an inability to discharge his parental duties and a failure to provide proper

8

parental care, which met the definition of neglect as charged in Counts III and IV. The magistrate also found the Department proved Father neglected Daughter as charged in Count II by failing to comply with the case plan and the fact that reunification had not occurred within the statutory period. On appeal, Father contends there was not clear and convincing evidence to support the magistrate's finding of neglect as to any of the counts.

The magistrate combined its discussion of Counts III and IV and found that Father neglected Daughter by (1) failing to provide her with proper parental care within the meaning of Idaho Code § 16-1602(25)(a) and (2) being unable to discharge his parenting responsibilities under Idaho Code § 16-1602(25)(b). Specifically, the magistrate found that not only was Father currently unable to independently provide for Daughter's needs, he will not be able to demonstrate such ability for a prolonged, indeterminate period given his history of an inability to comply with the law and ongoing concerns as to whether he can refrain from criminality and/or illegal substance abuse. For the reasons discussed below, we conclude there was the requisite evidence to support findings of neglect as alleged in Counts III and IV and, therefore, need not address the magistrate's finding as to Count II.

The magistrate found that during Daughter's lifetime, Father had only been physically present to provide day-to-day parenting for approximately the first ten months of her life. Over the preceding twenty-two months, Father was completely unable to provide a safe, continuous residence while meeting Daughter's needs, first because he was incarcerated for seventeen months and then because he was in a temporary residence for three months. Although he had been in his own residence for two months at the time of termination, according to his own testimony, he was not yet able to care for Daughter independently. Even under the best circumstances, the magistrate concluded the evidence indicated Father required six months to a year to complete the requisite treatment and then additional time to ensure he maintained his sobriety, refrained from criminal behavior, maintained a residence, and successfully complied with parole.

As to his criminal past, the magistrate noted that, most recently, Father had been incarcerated for over seventeen months, had just been released on parole, and had a sentence satisfaction date of September 2016. His criminal history dates back to 1994, and since then, every several years he committed new crimes and found himself back in custody. This extensive criminal history, the magistrate found, clearly demonstrates that Father's criminal behavior is

9

continuous and that he cannot, for any significant period, refrain from criminal activity when he is not incarcerated. And while he may have had periods of time where he did not commit new criminal offenses, his prolonged criminal history demonstrates that he inevitably reverts back to his old patterns, and thus, the magistrate concluded his pattern of criminality continues indeterminately.

Further, the magistrate noted that since approximately 1994, Father had intermittently used and/or abused both legal and illegal substances and has not yet demonstrated that he can refrain from substance abuse for any significant amount of time. The magistrate found that Father lied under oath at the termination trial regarding his opiate dependence, as Dr. Belnap provided medical records conclusively establishing he treated Father for opiate dependence in 2008 and 2009. The magistrate indicated that Father's deception as to his history of drug use caused the court great concern and to question his veracity in general, and noted that Father's drug and alcohol counselors all testified that a person's potential for relapse is greater for someone who has been untruthful about their drug use history. The magistrate, therefore, concluded Father is at a greater risk of relapse due to his deception.

In regard to the magistrate's finding of clear and convincing evidence to support Count III, which alleged Father neglected Daughter and will continue to do so for a prolonged, indeterminate period, Father contends the magistrate erred in focusing on his past criminal conduct and not his most recent efforts at rehabilitation to be in a position to care for his child. Specifically, he points to *In re Doe*, 142 Idaho 594, 130 P.3d 1132 (2006), where the Idaho Supreme Court reversed the magistrate's decision terminating a mother's parental rights to her child. There, the child was born while the mother ("Roe") was on juvenile probation and custody was vested in the Department when it appeared Roe was not providing adequate care. After successfully working on a case plan, Roe was reunited with her child. However, a year later, Roe was arrested for selling methamphetamine and later admitted to selling drugs in the presence of her child, as well as using alcohol, marijuana, and methamphetamine while having protective custody of the child. After her arrest, conviction, and sentencing to six years of probation, Roe began working on a new case plan and progressed to the point of being allowed unsupervised visits. However, given that the child had been out of Roe's custody for eighteen of the previous twenty-two months, the Department filed a petition for termination. At trial, the

10

Department's only witness, the social worker, testified she was not in favor of termination; however, the magistrate found termination was in the child's best interests.

On appeal, the Idaho Supreme Court concluded the magistrate's finding was erroneous, first concluding the magistrate erred in focusing on Roe's conviction and other past criminal behavior, while dismissing other relevant and competent evidence. *Id.* at 597, 130 P.3d at 1135. While noting that Roe's past criminal behavior was certainly relevant in considering whether to terminate her parental rights, the Court surmised that "in light of the other evidence presented, it does not constitute sufficient and competent evidence to support the magistrate court's findings for termination." *Id.* In reversing the magistrate's finding, the Court noted the record indicated Roe had "created a stable life, made her children her priority, successfully complied with and went beyond the court orders and the reunification plan, attended counseling and Alcoholics Anonymous and Narcotics Anonymous meetings." *Id.* at 598, 130 P.3d at 1136. The Court also noted the child and the parental termination action were both motivating factors in her decision to straighten out her life. *Id.*

In this case, Father contends that like in *Doe*, the magistrate placed too much emphasis on his past criminal behavior, while minimizing his most recent efforts, such as the facts that he obtained adequate housing, was employed, successfully completed the TC, was released on parole and complying with its terms, was participating in the aftercare program, had a relationship with Daughter, and was motivated by reunification with Daughter since the commencement of the child protection case. *Doe* is distinguishable from the instant case for several reasons. First, Father's criminal history is considerably more extensive than that in *Doe*--indeed, there is no indication in *Doe* that Roe had been incarcerated, while in this case Father, at age thirty-two, has been incarcerated for approximately eleven years since he was fourteen. Further, the record contains substantial competent evidence to support the magistrate's finding that Father's criminal actions have been fairly continual since he was fourteen years old and he has not proven he can remain law-abiding for any significant period of time. There was no evidence in *Roe* of criminal activity to this extent. Also, while the Supreme Court appeared to find in *Doe* that Roe's past criminal behavior was the magistrate's primary basis for termination, to the exclusion of other relevant evidence, such was not the case here. While the magistrate did place considerable emphasis on Father's criminal past, a clearly relevant consideration, *Doe*, 142 Idaho at 597, 130 P.3d at 1135, it also considered various other factors

11

in finding neglect, including repeated perpetration of domestic violence and substance abuse issues.

The magistrate specifically noted that testimony at trial established numerous instances of domestic violence perpetrated by Father against Mother, beginning while Mother was eight months pregnant with Daughter and including at least two violent altercations in Daughter's presence. And yet, at trial, Father only reluctantly admitted he "may" have a problem with domestic violence and repeatedly denied he ever physically struck Mother. In assessing Father's risk to Daughter, Wilson placed considerable weight on the numerous instances of domestic violence and the fact that Father minimized the impact domestic violence would have on Daughter. Wilson made it clear that without treatment, which Father had not yet received, there will remain a high risk for neglect. As the Department points out, our Supreme Court has identified the act of committing domestic violence in the presence of a child as a substantial basis for a finding of neglect. *Doe*, 151 Idaho at 365, 256 P.3d at 773. In *Doe*, the Court agreed Father neglected his children by failing to provide them with proper parental care and control pursuant to Idaho Code § 16-1602(25)(a) in numerous ways, with the "most apparent fact supporting this finding [being] Father's commission of an act of domestic violence in the presence of his children." *Doe*, 151 Idaho at 365, 256 P.3d at 773.

In addition to Father's past criminal history and perpetration of domestic violence, the magistrate also took into consideration Father's history of substance abuse and the troubling fact that he lied to the magistrate concerning his past addiction to prescription drugs. As the Department points out, Father's use of illegal drugs has led to repeated destructive behavior, including an extended period of incarceration rendering him unable to care for Daughter. There was also evidence Father had not put this problem behind him given his refusal to admit to illegal prescription drug use, a fact which concerned all relevant witnesses and caused them to be concerned about Father's continued sobriety.

Thus, we conclude the magistrate did not erroneously place too great of emphasis on Father's criminal history to the exclusion of other relevant evidence. Rather, it considered this evidence in concert with Father's history of domestic violence and substance abuse issues in making a finding of neglect. Further, the magistrate noted Father's recent progress, but was at liberty to conclude that his extensive negative history, with the issues above, amounted to neglect. *Accord Doe*, 144 Idaho at 843, 172 P.3d at 1118 (noting the magistrate considered

12

Mother's past criminal record, but did not rely exclusively on that factor when making the decision to terminate her parental rights).

Father also challenges the magistrate's finding as to Count IV, that he is currently unable to independently provide for the housing, financial, subsistence, and/or other needs of himself and/or Daughter and will not be able to demonstrate such ability for a prolonged, indeterminate period, which is contrary to Daughter's well-being. Specifically, he argues there was not substantial competent evidence to support this finding, noting his testimony that he had recently obtained appropriate housing for himself and Daughter, had transportation, and was employed. Further, he points out there was testimony presented that Daughter's needs were "minimal and would be easy for the Father to meet." He also points to testimony that he could access State funds to assist in financing daycare or could utilize Daughter's grandmother to provide childcare.

Father himself testified at trial that he is not yet in a position to independently care for Daughter; thus, we construe his argument on appeal as a challenge to the magistrate's finding that he would be unable to demonstrate an ability to do so for a prolonged, indeterminate period. We conclude, however, there was substantial competent evidence for the magistrate to make such a finding. Testimony at trial established it will take, at the very least, six months to a year for Father to complete his aftercare program and the domestic violence treatment recommended by Wilson. Then he must complete the requisite parenting education that cannot be commenced until his domestic violence treatment is completed. Finally, as the social worker testified, a significant period of time will be needed for Father to demonstrate he can apply the requisite skills, remain in compliance with the law, and refrain from substance abuse. Given Father's history, the social worker testified that in her estimation, this would be an additional year. *See Idaho Dept. of Health and Welfare v. Doe*, 151 Idaho 605, 610-11, 261 P.3d 882, 887-88 (Ct. App. 2011) (noting that once Doe was paroled, a significant amount of time must pass before he could show he is capable of providing a safe and stable home environment, and given his history of drug abuse, criminal activity, and inability to complete probation, it was likely considerable time would pass before he could regain custody of the child).

Further, as the Department points out, while Father testified he intends to complete his case plan and become a suitable parent for Daughter, the magistrate specifically found Father lacked credibility. The magistrate noted that in addition to lying under oath about his prescription drug use, Father's credibility was also undermined by the magistrate's impressions

13

of Father's testimony: he was often guarded and somewhat vague with his trial testimony; he appeared aloof, argumentative, and defiant at times during the trial; he continually appeared to minimize the significance of his actions and the extent to which they contributed to Daughter's removal from his custody; and he continually appeared to minimize the extent to which his history of criminal behavior, substance abuse, and domestic violence issues have affected his ability to reunify with Daughter. Based on this finding, it was not unreasonable for the magistrate to express skepticism that Father would follow through with his stated intent. Where there was evidence Father could not independently care for Daughter for up to a year or longer, as well as evidence casting doubt on his ability to comply with the requirements to do so (his extensive criminal, substance abuse, and domestic abuse history and lack of credibility), we conclude there was substantial competent evidence for the magistrate to find the Department proved the allegation integral to Count IV, that Father would be unable to demonstrate the ability to care for Daughter for a prolonged, indeterminate period. In sum, we conclude there was substantial and competent evidence presented for the magistrate to find Father neglected Daughter as alleged in Counts III and IV.

## B. Best Interests of the Child

Father also contends there was not clear and convincing evidence to support the magistrate's finding that it was in Daughter's best interests for his parental rights be terminated. In order to terminate Father's parental rights, the trial court is required to find that termination of parental rights is in the best interests of the child. I.C. § 16-2005(1). In this instance, the magistrate found termination was in Daughter's best interests for several reasons. The magistrate first noted that although Father completed a prison program and was making efforts to establish and maintain a relationship with his daughter while on parole, succeeding in a prison environment, which is secure and where Father did not have access to drugs and alcohol and was not subjected to the normal stressors and temptations of daily life, is different than succeeding after being released. The magistrate found that Father's actions and omissions prior to his incarceration, his subsequent incarceration, and his history of criminality and poor lifestyle choices demonstrated Father's inability to provide proper parenting to Daughter and this inability would continue indefinitely. The magistrate also found that, during his trial testimony, Father appeared to not fully appreciate the risks he exposed Daughter to and seemed to either be in

14

denial about his problems with domestic violence and substance abuse or was deliberately minimizing their significance.

Further, the magistrate found that Father had not provided Daughter with the type of day-to-day support normally associated with being a parent and that the record was clear Father would require a significant period of monitoring where he would have to show he could maintain his sobriety, employment, and residence, refrain from criminal behavior, and meet Daughter's needs. Father himself testified he was not yet ready to provide for Daughter, and the magistrate noted the evidence presented to the court indicated it will be a significant period of time before Father is in the position to do so. The magistrate surmised Daughter "has been waiting long enough for her parents to do what they need to do to be parents to her" and it was not in her best interests to wait another year, or more, to see if Father becomes a fit parent. Where Daughter was not yet three years old, which the social worker testified was a critical time in her life, the magistrate determined she needed to be offered permanence and stability, which Father could not provide.

The magistrate also noted that while it was evident from Father's testimony at trial that he loves Daughter, proper parenting is not provided through love alone. Being a parent requires the ability to consistently provide emotional, financial, and physical support for a child, and the magistrate determined Father did not demonstrate he possessed the independent ability to provide such support. Furthermore, during the approximately ten months when he was involved in Daughter's life before being incarcerated, he was engaged in extremely risky, illegal, and dangerous activity.

Considering the bond between Daughter and Father, the magistrate found the record indicated Father had less than twenty visits with Daughter during his incarceration and since his release, leading the magistrate to conclude it "cannot see how any bond, even if one existed, is worthy of being strengthened and/or preserved." In conclusion, the magistrate stated that for almost two-thirds of Daughter's life, Father had not been a consistent, appropriate, sober, or supportive parent and, given this failure to provide proper parental care over the course of Daughter's life, termination of his parental rights was in Daughter's best interests.

On appeal, Father contends the magistrate erred in this finding because the State failed to introduce sufficient evidence that termination of his parental rights would be in the best interests of Daughter. Specifically, he argues he should be allowed more time to prove his fitness to

parent because, since his release from prison, he had only a few months to work on the case plan. He points out that even in this short time frame, he obtained a job, housing, and transportation and continued participating in aftercare treatment. Father bases this argument on *Department of Health and Welfare v. Doe*, 150 Idaho 752, 250 P.3d 803 (Ct. App. 2011), where this Court indicated the guardian, social worker, and trial court may have incorrectly viewed the court's only options at the termination hearing as either to immediately terminate the father's parental rights or immediately return the children to him. We indicated that such was not the choice, as the only issue presented was whether the father's parental rights would be terminated at that time, not whether he was able to resume custody immediately. *Id*. at 762, 250 P.3d at 813. Specifically, we indicated the trial court could have allowed additional time for the father to secure appropriate housing, improve his financial situation, and continue his commitment to sobriety, aided by the Department resuming the role of working to facilitate reunification. *Id*.

This case is distinguishable from *Doe*. Here, there is no evidence, nor does Father point to any, that the magistrate or any of the parties involved exhibited the erroneous belief that the magistrate's only options were to immediately terminate Father's parental rights or to immediately return Daughter to Father. Rather, the magistrate, while recognizing Father's recent achievements, surmised that Father would need a significant amount of time before he could possibly be considered a fit parent and it was not in Daughter's best interests to wait an additional year or more to see if Father becomes a fit parent. It is evident from the record that the magistrate considered the possibility of waiting to see if Father would eventually become able to care for Daughter, but found it was *not* in Daughter's best interests to do so.

Our decision in *Doe*, 151 Idaho 605, 261 P.3d 882, is instructive. In that case, the father had been incarcerated for the entirety of the approximately thirty-month-old child's life, and would be for at least another year and a half, and there are analogous considerations to the case here. In assessing whether there was sufficient evidence to uphold the magistrate's finding that it was in the child's best interests for Doe's parental rights to be terminated, we noted Doe had a long history of drug addiction and criminal convictions and incurred new drug-related charges even when he was aware he was about to become a father. We also noted that while the record demonstrated Doe made efforts to maintain his parental relationship with the child through frequent visits, he had not, however, provided the child with the day-to-day support normally associated with parenting. We concluded the magistrate did not err:

16

> [I]t is likely it will be a long time, once he is released from prison, before Doe will be prepared to parent J.S. It is of great importance that, as a very young child, J.S. is offered permanency and stability. This, Doe cannot provide. Thus, there is substantial evidence in the record to support the magistrate's finding that termination would be in J.S.'s best interests. Therefore, we hold the magistrate did not err in finding that termination was in J.S.'s best interests.

*Id.* at 605, 261 P.3d at 882. Likewise here, Father has a demonstrated lengthy history of substance abuse and criminal activity, having been incarcerated for approximately eleven of the last eighteen years. Further, his criminal activity did not cease once Daughter was born; on at least three occasions after her birth, police responded to reports of domestic violence perpetrated by Father against Mother, at least twice in the presence of Daughter. His most recent conviction, for felony possession of methamphetamine, came when Daughter was nearly ten months old. Also, like in *Doe*, although Father made efforts to maintain his relationship with Daughter by participating in visits with her, he was not available to provide her with day-to-day care since she was ten months old and will not be able to do so for a significant, indeterminate period. Furthermore, as this Court recognized in *Doe*, it is of "great importance" that young children, such as Daughter, be offered permanency and stability. Father, upon his own admission, is unable to provide such care at this time. Both the social worker and the guardian ad litem testified that Daughter is in her formative years and needs permanence and stability.

Additionally, while Father would have the magistrate, and now this Court, believe he is on the right track, having recently obtained housing and employment, and is mere months away from being able to care for Daughter full-time, there was significant evidence to support the magistrate's finding that Father's recovery is not a sure-thing, or even particularly likely, given his deception regarding his abuse of prescription medication and denial that he ever physically assaulted Mother. In fact, one of Father's TC counselors estimated that parolees who take part in the aftercare program have a fifty-fifty chance of maintaining sobriety and then indicated he would be particularly concerned about someone who failed to disclose the extent of their substance abuse while in treatment--which it became evident Father failed to do.

Finally, we note that while Father's love for Daughter is evidenced by his own statements and by the testimony of those who have described his visits with Daughter as positive, the Idaho Supreme Court has been very clear that a parent's love for his or her child is simply not enough:

> [A] child may not live on parental affection alone. . . . The fact that [the parent] wants her children and has waged a continuous legal battle to effect their return to

her does not necessarily mean that she can and will provide an adequate home environment for them.

*State ex rel. Child v. Clouse*, 93 Idaho 893, 896, 477 P.2d 834, 837 (1970).

For the reasons discussed above, we conclude there was sufficient evidence to support the magistrate's conclusion that termination of Father's parental rights was in Daughter's best interests. Father has a long, documented history of drug abuse, numerous criminal convictions involving illegal drug use and possession (the most recent in 2010), a history of domestic violence, and is currently on parole. Although he completed a substance abuse treatment program while incarcerated and has recently obtained a home and employment, he would require a significant amount of time to obtain additional treatment and then to prove he has abandoned this long pattern of drug activity and criminal behavior and can provide a safe and stable home for Daughter. Further, there was doubt placed on the extent of his "recovery," as there was sufficient evidence to support the magistrate's finding that Father lied when he testified he had never abused prescription drugs and never physically assaulted Mother. These considerations, in light of Daughter's young age and Daughter's need for stability and permanence, lead us to conclude the magistrate did not err in finding it was not in Daughter's best interests to wait for a significant, indeterminate time period to see if Father could do something he essentially has never done--live free of substance abuse, domestic violence, and other criminal activity while maintaining stable housing, employment, and the ability to sufficiently provide for Daughter's needs for any significant period of time.

### III.

### CONCLUSION

The magistrate did not err in finding, by clear and convincing evidence, that Father neglected Daughter as charged in Counts III and IV of the petition to terminate his parental rights. Likewise, the magistrate did not err in finding termination of Father's parental rights was in the best interests of Daughter. Accordingly, we affirm the magistrate's decree terminating Father's parental rights.

Chief Judge GRATTON and Judge MELANSON **CONCUR.**